UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMIE MANNINA[1]<br><br>    Plaintiff,<br><br>v.<br><br>O'KEEFE MEDIA GROUP<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>  and<br><br>JAMES O'KEEFE<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>  and<br><br>HEIDI DOE<br>Address Unknown<br><br>    Defendants. | Civil Action No. 25-_____ |

\* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT**
**(Trial By Jury Requested)**

This civil action emanates out of a disturbingly common trend in modern day "yellow journalism": the secret video recordings of public servants and/or perceived Democrats who are specifically targeted and entrapped into making remarks under false pretenses. Plaintiff Jamie Mannina ("Mr. Mannina") brings this action seeking damages for civil tort claims of false light, defamation, fraudulent misrepresentation, conspiracy to commit fraudulent misrepresentation, and violation of the Federal and District of Columbia ("D.C.") Wire Tap Acts against three

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

defendants: O'Keefe Media Group ("OMG"), James O'Keefe ("O'Keefe") and an individual believed to be an OMG employee, Heidi Doe ("Heidi").

## JURISDICTION

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over this action given that the tortious injury occurred in the District of Columbia.

## VENUE

3. Venue is appropriate under 28 U.S.C. § 1391(b)(2) as the tortious injury occurred in the District of Columbia.

## PARTIES

4. Plaintiff Mr. Mannina is a United States ("U.S.") citizen and private figure. He is a former staff member for then-Senator Hillary Clinton (D-NY)("Senator Clinton"), worked at the Office of the Director of National Intelligence ("ODNI"), was a special agent for the Federal Bureau of Investigation ("FBI") and served as a government contractor with the Department of Defense ("DoD"). He has held a security clearance with the U.S. Government for sixteen years.

5. Defendant O'Keefe Media Group ("OMG") is a Limited Liability Corporation organized in the State of Delaware and listed under File Number 7304748. The date of incorporation for OMG is listed as February 17, 2203, and its headquarters appears to be based in West Palm Beach, Florida, although an actual public address for OMG is not available. Its sole known member is Defendant O'Keefe.

6. Defendant O'Keefe is a U.S. citizen and, upon information and belief, a resident of the State of Florida. A publicly-listed personal mailing address for O'Keefe is not currently available. Up until February 2023, he was the CEO and founder of Project Veritas, which routinely engages in the same type of conduct described within this Complaint. He was removed and/or left from Project Veritas in February 2023 due to alleged "financial malfeasance" related to his use of "an excessive amount of donor funds" on personal luxuries, and subsequently created OMG. In 2010, he criminally pled guilty to unlawfully entering federal property.

7. Defendant Heidi Doe ("Heidi") is a natural person and, upon information and belief, an employee or associate of OMG and O'Keefe. The true legal name of Heidi, as well as her place of residence, is not presently known.

## FACTS

### Mr. Mannina

8. Mr. Mannina earned a bachelor's degree in political science in 2004 from Le Moyne College in Syracuse, New York. During his senior year, he got an internship in the office of Senator Clinton. His strong performance led to him being hired as a staff member in 2005. When Senator Clinton was nominated by then-President Obama to be Secretary of State in 2009, Mr. Mannina transitioned to serving as a political appointee at the Department of State where he remained until 2015. Between 2014 and 2015, he also earned a Master's Degree in International Policy and Practice from The George Washington University.

9. In 2015, Mr. Mannina accepted a job with ODNI and he continued working there during the first administration of President Donald J. Trump ("President Trump"). At all times throughout, he faithfully performed his duties and proudly served his country. In March 2019, he

joined the FBI and was assigned to its field office in Los Angeles as a special agent in the counterintelligence division.

10. In 2017, during which time Mr. Mannina was working at ODNI, he published three articles in the *Huffington Post* and *The Hill* that were openly critical of then-President Trump. Mr. Mannina ensured the articles were properly cleared for publication by ODNI, and his current employment status was not referenced. Instead, he was openly described as "a longtime aide to Hillary Clinton and recently served as a Defense and Foreign Policy Advisor for her 2016 presidential campaign."

11. Mr. Mannina left Government service in May 2020, when he joined Booz Allen Hamilton ("Booz Allen"), a major defense contractor. In April 2022, Mr. Mannina began performing duties at the Pentagon supporting the Joint Staff, which consists of the senior uniformed leaders of each military branch and is commonly referred to as the Joint Chiefs. It operates under the overall leadership of the DoD senior uniformed officer, the Chairman of the Joint Chiefs of Staff ("CJCS"). The Joint Staff is divided into various directorates and sections and Mr. Mannina worked in the J6, the directorate responsible for Command, Control, Communications and Computers/Cyber. There are over 1,300 active-duty military personnel, 1,200 civilian full-time equivalent employees, and over 1,600 full-time equivalent contractors who work with the Joint Staff.

12. Mr. Mannina's duties at the Joint Staff were as a strategic analyst. He provided analysis on DoD and Joint Staff efforts related to artificial intelligence, cybersecurity policy, modernization, and governance. He was directly supervised by a military officer at the Joint Staff and by two civilian contractors at Booz Allen.

13. During the 2024 election cycle, Mr. Mannina volunteered in his personal time with a 501(c)(4) advocacy organization called *National Security Leaders For America* which describes itself as a "bi-partisan, all-volunteer organization of former military and civilian leaders uniquely qualified to warn about U.S. national and economic security threats." It has as its stated mission to improve public awareness of public policy by promoting issues on related topics to provide subject matter expertise to policymakers and the media.

14. Mr. Mannina is single. Just like millions of Americans, he uses dating applications, such as Bumble, to meet others socially and romantically. Mr. Mannina's goal in using Bumble was to seek a genuine, loving, and lasting relationship that could lead to marriage.

### *Bumble Dating App*

15. Bumble is a dating app that allows users to create individual profiles which its proprietary systems will use to connect potentially suitable users with each other. The system allows users to filter other profiles by location, age, shared interests, and other factors to help ensure users are offered profiles that match their personality and values.

16. A user may view other profiles and "swipe" or select on their smartphone a profile that interests them. A prominent feature offered by Bumble, which it uses to distinguish itself from other dating apps, is that only the female user can then initiate actual contact with a male user. The two users can then exchange messages and even video calls and audio chats within the app, or they can provide personal contact information that allows them to contact through other mediums.

17. Bumble offers its app for free, but for an added subscription fee users receive enhanced services. Mr. Mannina paid approximately $34 a month for the Bumble Premium service which

included more filtering options, the ability to change your profile location, and greater access to those who are interested in you.

18. When signing up with Bumble, a user has to agree to Bumble's terms and conditions of use ("Terms"). Users must be over 18 years old, must use their real name and true age for both their account and profile, are not allowed to use another person's Bumble account or to share their Bumble account with any other person without permission and are responsible to ensure that any use of their account complies with the Terms. Notably, users are restricted from using Bumble in a manner that "impersonate or intends to deceive or manipulate a person (including, without limitation, scams and inauthentic behavior)", i.e., users are not permitted to misrepresent their identity.

19. Bumble's Terms require users to agree to follow its community guidelines, which prohibits "Inauthentic Profiles" and makes clear that: "Bumble celebrates authenticity, and we expect all our members to represent themselves accurately on their profile. We don't allow impersonation or misrepresentation on our platform. This includes catfishing (i.e. creating an online persona that isn't you) or falsely stating facts about yourself (including name, gender, age, and permanent location)."

20. Bumble's community guidelines also prohibit "Scams and Theft" which includes "any scam or theft activity intended to defraud or manipulate members out of financial or material resources. This includes requesting or seeking financial support, lying about your intentions for financial gain, or faking romantic intentions to deceive members out of financial or material resources."

21. Mr. Mannina's profile included pictures of himself and his dog, and a photo of his late mother who he was very close with. He included his interests in travel, New York, and pizza. He

did not include any commentary about his political views or thoughts on the political views of others. For his work description, Mr. Mannina merely generally stated he was an "Artificial Intelligence Senior Advisor" in "Government Consulting".

### *Mr. Mannina Connects with Heidi*

22. In late December 2024, Mr. Mannina was contacted on Bumble by Defendant Heidi Doe. Her profile was in a "travel mode" and set for the District of Colombia, meaning she was allegedly currently living in D.C., but not permanently. Heidi's profile included attractive photos of herself, including on a beach in Hawaii. It listed her age as 25 years old, identified her political affiliation as a liberal supporting LGBTQ+ rights and feminism, and stated she was seeking both casual dates and potentially a long-term relationship. Mr. Mannina found her to be a potential good match and agreed to the outreach.

23. In their initial interactions, Heidi informed Mr. Mannina she was a traveling nurse who was originally from Hawaii but who would be relocating to D.C. in early January 2025. They shared phone numbers and on January 7, 2025, began to text each other outside of the Bumble application. They continued with standard, casual texting as new acquaintances over the next two days and agreed to meet for a date at Jaleo, a well-known and popular restaurant in D.C., on the evening of January 9, 2025.

### *First Date*

24. Mr. Mannina and Heidi had a table in the middle of the restaurant's dining room with other diners all around them. Heidi sat across from him and kept a personal bag on the table initially until dinner came out. They began talking about Heidi's relocation to D.C., her work as a nurse at a local hospital, where she was from, her family, and what she was looking for in a

7

relationship – the kind of subjects that would be expected on a first date. They talked about Washington, D.C., and Mr. Mannina told her he would love to show her the National Art Gallery.

25. Early in the conversation Heidi began to change the subject and ask questions about Mr. Mannina's work, pressing him for more details as he told her about what he did at the Pentagon and directly soliciting information about his political views. She repeatedly made it clear she did not support then-President-Elect Trump and asked Mr. Mannina specifically about his opinions concerning the recent 2024 presidential election. She told Mr. Mannina that she had previously had "nightmare" dates where her date would not talk or share anything with her and she felt she could not get to really know them, and she appreciated the more in-depth conversation she was having with Mr. Mannina. In response to her questions, Mr. Mannina talked about his prior work with Senator Clinton, his work at the Department of State and FBI, that he had done counterintelligence work and that he was a "spy hunter." He also proudly talked about his work at the Pentagon and its importance. He told her he been working on a major topic that would be presented to the CJCS in a special room called "the Tank" at an important meeting the next day. He expressed to her some nervousness because he had never been to such a high-level meeting before. He also expressed his own negative feelings about President-Elect Trump, and he relayed readily available information from media sources that put the incoming nominee to serve as Secretary of Defense in a bad light.

26. Throughout the evening Heidi frequently would check her phone and respond to text messages. She excused herself at one point to use the restroom, and when she came back again changed the subject they had been talking about back to questions about his work and politics.

27. The date ended at approximately 10:00 pm, and Mr. Mannina paid for dinner, which was approximately $200.

### *Second Date*

28. The next day, Heidi and Mr. Mannina agreed over text to go on a second date at a restaurant in D.C. They planned to have lunch on Saturday, January 11, 2025, at a restaurant near the area commonly referred to as the "Wharf".

29. During the date, Heidi asked Mr. Mannina about the meeting in "the Tank" and what his topic had been about. He gave her general answers and included only publicly available information, though he said it played it up as being very sensitive in order to better impress her. As with their first date, Heidi was the one who routinely steered the conversation back to politics and Mr. Mannina's work for the U.S. Government. Heidi asked so many questions that at one point Mr. Mannina jokingly asked if she was a spy. For his part, he continued to answer questions as best as he could, but he also tried to steer the conversation back to personal views on relationships or life views, which were important for him in evaluating someone for a possible relationship.

30. At the end of their lunch date Mr. Mannina again paid for the meal, which was about $30.00. As they left the restaurant an individual approached Mr. Mannina and Heidi from behind with a microphone. Two other men were with him, both openly with cameras recording the situation. The man with the microphone called him by name and said: "Jamie, you're a spy hunter, you say. Well, I'm a spy hunter too but I'm evidentially a better spy hunter than you." As he said that, Heidi turned away from Mr. Mannina and walked in the opposite direction, leaving a confused Mr. Mannina to fend for himself.

### *Initial Confrontation By Defendant O'Keefe And Consequences*

31. The man who spoke was Defendant O'Keefe. He and his two camera operators followed Mr. Mannina around the vicinity of the restaurant and into the parking garage where Mr. Mannina's vehicle was in, during which time they repeatedly pestered him with questions and accusations.

32. Upon information and belief, on Monday, January 13, 2025, Defendant O'Keefe contacted the DoD Public Affairs office and provided them with information about Mr. Mannina, including a copy of at least parts of the video of the two dates with Heidi. Booz Allen also became aware of the video and Mr. Mannina was removed from the Pentagon that same day.

33. The next day, Tuesday, January 14, 2025, Mr. Mannina was fired from Booz Allen. His termination letter stated that "[d]ue to Violating the Information Security Policy, Booz Allen Hamilton is terminating your employment with the firm effective immediately. As a result, you are ineligible for rehire or future business opportunities with the firm." No policies were ever identified nor was Mr. Mannina even allowed a reasonable opportunity to respond to the allegations. Booz Allen, because of the activities of the Defendants, simply discarded Mr. Mannina because of a perceived political controversy surrounding his views of the incoming Trump administration. Booz Allen was unwilling, despite requests, to provide Mr. Mannina with any accommodation, support or assistance. To the contrary, the company took steps that unnecessarily further harmed Mr. Mannina and his career. Mr. Mannina has been unemployed since his termination.

34. Upon information and belief, this was not the first time the Defendants used dating apps to arrange dates with individuals whom Defendants OMG and O'Keefe sought to target as part of their efforts to further their extreme partisan political agenda.

*Publication of Videos On the Internet*

35. On January 14, 2025, Defendants OMG and O'Keefe published a video on the OMG YouTube channel (which, at the time of the filing of this Complaint, has over 322,000 subscribers) with the provocative title "Pentagon Advisor Reveals Conversation 'to Explore What We Can Do' to 'Protect People from Trump'" ("Secret Video"). The video featured numerous short clips and edits that spliced together various comments made by Mr. Mannina over the course of the two dates, along with dramatic narration by Defendant O'Keefe. It also includes, after approximately 2:42 of multiple clips, a title sequence with the OMG logo stating, "OMG Investigates" and then underneath it "Dating The Deep State." The video includes a caption naming Mr. Mannina and listing his roles as being "Senior Advisor, Joint Staff, Department of Defense" along with "Fmr, Special Agent, FBI" and "Fmr Special Assistant Hillary Clinton." The video also featured two advertisement segments narrated by Defendant O'Keefe. Altogether, the video is 19:47 long and, as of the filing of this Complaint, has had over 124,000 views and over 12,000 thumbs up.

36. At some point later in the same day, January 14, 2025, Defendants OMG and O'Keefe published a second video on the OMG YouTube channel titled "JUST IN: Top Pentagon Advisor Jamie Mannina has just been FIRED" ("Termination Video"). In this video Defendant O'Keefe reads part of a statement purportedly from the Pentagon Public Affairs office and includes audio clips from a phone conversation with a member of that office. According to Defendants OMG and O'Keefe, the DoD statement, which the Defendants OMG and O'Keefe published, read: "Jamie Mannina is not an advisor to the Chairman of the Joint Chiefs of Staff or the Joint Chiefs, nor has he interacted with the Chairman or the Joint Chiefs. We can confirm Mannina was a Booz Allen Hamilton contracted employee with the Joint Staff J6 Command, Control,

Communications and Computers/Cyber Directorate. The alleged comments by Mannina do not reflect the positions of the Chairman or the Joint Staff. Furthermore, the Chairman looks forward to working as President-elect Donald J. Trump's principal military advisor in the next administration. Any further questions related to Mannina should be directed to Booz Allen Hamilton."

37. In the Termination Video, O'Keefe proudly announces that Mr. Mannina the "top advisor to the Joint Chiefs of Staff at the Pentagon has been terminated." He also takes credit for Mr. Mannina being fired, reads from a paper in his hands that is purportedly the DoD statement mentioned above, then replays the recorded conversation with the DoD Public Affairs Officer, and then again states that the termination came just on the heels of the Secret Video posted earlier in the day. This video closes with a promise of another video to be released the following day that would show other interactions with Mr. Mannina. The Termination Video is 2:04 long, and, at the time of the filing of this Complaint, it had been viewed over 70,000 times and over 10,000 viewers had given it a thumbs up.

38. On January 15, 2025, a third video was posted on the Defendant OMG's YouTube channel with the title "WILD INTERACTION: O'Keefe Confronts Top Pentagon Official Caught on Tape" ("Ambush Video"). This video primarily featured Defendant O'Keefe following Mr. Mannina around the area outside of the restaurant after the second date, and then into a parking garage, while pestering him with questions and accusations. As with the Secret Video, it also includes a title sequence with the OMG logo stating, "OMG Investigates: Dating The Deep State." The video is 11:07 long and also included selected clips from the Secret Video of the two dates. At the time of the filing of this Complaint, this video had over 114,000 views with over 15,000 viewers having given it a thumbs up.

39. In addition to having a YouTube channel, Defendant OMG maintains its own website. On January 15, 2025, Defendant OMG's website published an article with the title "BREAKING VIDEO: Top Pentagon Advisor Reveals On Hidden Camera Conversation 'with a Couple of Retired Generals to Explore What We Can Do' to 'Protect People from Trump.'" The author is simply listed as "OMG Team." The article includes a picture of Mr. Mannina presumably extracted from one of his own social media pages (and without authorization), along with other images taken from the videos and a picture of a document which appears to be the statement sent by the Pentagon Public Affairs office, including an official's full name and phone number, and referred to in the Termination Video. The Secret Video posted the previous day on YouTube is embedded into the article on the OMG website.

40. Also on January 15, 2025, Defendant OMG's website posted a second article titled "WILD INTERACTION: O'Keefe Confronts Top Pentagon Official Caught on Tape saying He's in Conversation 'with Retired Generals to Explore What We Can Do' to 'Protect People from Trump.'" As with the article published with the Secret Video, this one includes screen shots from the Ambush Video along with an embed link that allows the video to be viewed.

*False Statements & False Implications*

41. The YouTube publication of the Secret Video contains a description of the contents in a shaded area. In this description, Defendant OMG falsely accuses Mr. Mannina of having "plans to utilize irregular strategies to undermine Donald Trump's presidency." It describes his work with a private organization during the previous election, accuses Mr. Mannina of being part of a meeting at the Pentagon regarding technology issues, and that Mr. Mannina had made "critical remarks" about President Trump's nominee for Secretary of Defense, Pete Hegseth, in which he talked about negative information that had been widely disseminated in the news.

13

42. The article which accompanied the Secret Video on the Defendant OMG website claims the video would "reveal strategies and covert meetings aimed at influencing public perception and undermining the presidency of Donald Trump." It asserts Mr. Mannina acknowledged "collaborating" with senior retired military leaders "to devise methods to counteract Trump's administration" and falsely claims these meetings "occurred in high-security environments, including 'The Tank,' a secure room within the Pentagon reserved for critical defense deliberations." It further states that his "role extended beyond advising military officials" and included work with an advocacy group during the prior election which opposed the re-election of President Trump. The article concludes by describing Defendant OMG's follow-up with the Pentagon Public Affairs office which confirmed "Yes, he did work [on the Joint Staff]," and that Mr. Mannina was terminated because of Defendant OMG's actions. It quotes the Pentagon official as stating, "Yeah, that's the standard practice with contractors. This is obviously someone speaking out of turn and falsely in public." In discussing Mr. Mannina with the Pentagon official, it is unknown what Defendant OMG claimed Mr. Mannina had said.

43. The article accompanying the Ambush Video on the Defendant OMG website claims the "confrontation" between Defendant O'Keefe and Mr. Mannina followed Defendant "OMG's release of undercover footage that detailed Mannina's admission to conversations about plans involving retired generals to take potential actions against President-elect Donald Trump." In fact, Defendant O'Keefe's ambush of Mr. Mannina occurred immediately as Mr. Mannina was leaving the restaurant after the second date with Heidi, prior to the release of any of the videos and without Mr. Mannina's knowledge that both of his dates had been secretly recorded and were targeted set-ups designed to elicit statements that could be used to depict him as trying to undermine the new Trump administration from his job in the Pentagon.

14

44. While Defendant OMG identified Mr. Mannina as a "Top Pentagon Advisor," a "Senior Advisor, Joint Staff, Department of Defense" and a "Top Pentagon Official," the image of the letter from the Pentagon official states that Mr. Mannina is "not an advisor to the Chairman of the Joint Chiefs of Staff or the Joint Chiefs". Indeed, Mr. Mannina was actually simply one of a countless number of defense contractors supporting the Joint Staff.

45. Through numerous edits and splices from statements made throughout both dates, and even between each date, the various videos and articles were created to intentionally provide false or implied evidence to support Defendant OMG and O'Keefe's fabricated claims that Mr. Mannina was essentially attempting to launch an unlawful coup against President Trump.

## COUNT ONE
## DEFAMATION/DEFAMATION *PER SE*/DEFAMATION BY IMPLICATION
### (Against All Defendants)

46. Mr. Mannina realleges and incorporates by reference paragraphs 8 to 45, above.

47. Defendants falsely state or imply in their videos and articles that Mr. Mannina was a senior Pentagon Official providing direct advice to the CJCS and part of a subversive "Deep State" that held covert meetings with retired military leaders, including admirals and generals, who were collaborating from within the Pentagon on the means to undermine and counteract the incoming Trump administration. These meetings supposedly took place in highly secure locations, including "The Tank", that were "reserved for critical defense deliberations." The Defendants further falsely state or imply that Mr. Mannina, in his official capacity, was lying, spying, conspiring to commit a coup, and acting unethically.

48. These statements and their implications are objectively false statements of fact and constitute defamation. They are neither rhetorical hyperbole, opinion, or loose commentary.

Any objective reasonable viewer of the statements would construe them as assertions of fact capable of verification.

49. These defamatory statements were published online for public viewing by anyone with access to the Internet. The Secret Video and Ambush Video that were posted on Defendant OMG and O'Keefe's YouTube channel alone have been viewed over a hundred thousand times each.

50. These defamatory statements have caused identifiable harm to Mr. Mannina, not only to his employment but also to his personal and professional reputation. These damages, which includes serious mental distress, were reasonably foreseeable to the Defendants and were the understandable byproduct of their publication of the defamatory statements.

51. The Defendants are therefore liable for compensatory damages, as well as further liable for punitive damages given the deliberate and outrageous nature of the defamation. The Defendants had actual knowledge of the falsity of the statements at issue. The publication of those statements were knowingly false and made with actual malice.

**COUNT TWO
FALSE LIGHT
(Against All Defendants)**

52. Mr. Mannina realleges and incorporates by reference paragraphs 8 to 45, above.

53. Defendants falsely state or imply in their videos and articles that Mr. Mannina was a senior Pentagon Official providing direct advice to the CJCS and part of a subversive "Deep State" that held covert meetings with retired military leaders, including admirals and generals, who were collaborating from within the Pentagon on the means to undermine and counteract the incoming Trump administration. These meetings supposedly took place in highly secure locations, including "The Tank", that were "reserved for critical defense deliberations." The

Defendants further falsely state or imply that Mr. Mannina, in his official capacity, was lying, spying, and acting unethically.

54. These statements and their implications are objectively false statements of fact and place Mr. Mannina in a false light which would be objectionable to any reasonable person.

55. These statements were published online for public viewing by anyone with access to the Internet. The Secret Video and Ambush Video that were posted on Defendant OMG and O'Keefe's YouTube channel alone have been viewed over a hundred thousand times each.

56. The false light which these statements and their implication cast on Mr. Mannina has caused identifiable harm to Mr. Mannina, including resulting in serious mental distress. These damages were reasonably foreseeable to the Defendants and were the understandable byproduct of their publication of the videos and statements accompanying the videos.

57. The Defendants are therefore liable for compensatory damages, as well as further liable for punitive damages given the deliberate and outrageous nature of the defamation. The Defendants had actual knowledge of the falsity of the statements at issue. The publication of those statements were knowingly false and made with actual malice.

## COUNT THREE
## FRAUDULENT MISREPRESENTATION
## (Against All Defendants)

58. Mr. Mannina realleges and incorporates by reference paragraphs 8 to 45, above.

59. At the behest of Defendants OMG and O'Keefe, Defendant Heidi Doe knowingly and deliberately misrepresented herself to Mr. Mannina for the purpose of targeting and entrapping him into making remarks that could be distorted for political and harmful purposes. Heidi offered up a false version of herself through her Bumble profile and throughout the course of her interactions with Mr. Mannina during their two dates, particularly to provide a false image

of her political views. She deliberately misrepresented her intent in posting her profile on Bumble, which violated the terms and conditions and community guidelines by creating an "inauthentic profile." Heidi was not interested in seeking romantic connections, nor was she personally interested in Mr. Mannina. She was simply part of an intentional targeted operation against individuals perceived to be Democrats to materially and falsely discredit them.

60. Heidi's false representations were material to inducing Mr. Mannina to engage with her through the Bumble App, communicating with her about potential dates, agreeing to go on two dates with her, and eliciting him to talk about himself in a manner he would not otherwise have done had he known her actual intent.

61. The Defendants deliberately, and at all times, intended for Heidi to intentionally deceive Mr. Mannina in order to obtain information which could be used to create damaging manipulated videos and articles to support the extreme political agenda of Defendants OMG and O'Keefe.

62. Mr. Mannina not only paid for the dates with Heidi, but as a natural and proximate consequence of her fraudulent misrepresentations he has suffered serious mental distress, the loss of his employment, and substantial damage to his personal and professional reputation.

63. The Defendants are therefore liable for compensatory damages.

## COUNT FOUR
## CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

64. Mr. Mannina realleges and incorporates by reference paragraphs 8 to 45, above.

65. The Defendants conspired to have Heidi knowingly and deliberately misrepresent herself to Mr. Mannina for the purpose of entrapping him into making inflammatory and

damaging remarks. The Defendants arranged for Heidi to knowingly provide Mr. Mannina with false information regarding herself, particularly with respect to her political views.

66. Defendants OMG and/or O'Keefe employed or contracted with Heidi for the purpose of targeting former or current civil servants such as Mr. Mannina in order to entrap them into making inflammatory and damaging remarks that could be manipulated and sensationalized in videos that would be posted online. The Defendants conspired with each other to knowingly provide Mr. Mannina with false information in order to secretly record his conversations and distribute selected excerpts and clips without his authorization.

67. The Defendants are therefore liable for compensatory damages.

### COUNT FIVE
### VIOLATION OF 18 U.S.C. § 2511 AND D.C. CODE § 23-542 – WIRE TAP ACTS
### (Against All Defendants)

68. Mr. Mannina realleges and incorporates by reference paragraphs 8 to 45, above.

69. Defendants recorded both dates and the ambush without the consent or authorization of Mr. Mannina. Mr. Mannina was not aware the dates were being recorded and he objected numerous times to being recorded as part of the ambush by Defendants OMG and O'Keefe.

70. Notwithstanding the District of Columbia being a one-party consent jurisdiction, 18 U.S.C.§ 2511 and D.C. Code § 23-542 nonetheless prohibit the interception and recording of a communication if it was for the purposes of committing a tortious act.

71. At all times the Defendants intended to obtain recordings of statements under false pretenses from Mr. Mannina which would be manipulated, edited and spliced together along with written comments that were designed to place Mr. Mannina in a false light and/or defame him, which are tortious acts.

72. The Defendants are therefore liable for actual damages, to include any profits made by the violations, along with punitive damages and attorneys' fees and costs given the deliberate and outrageous nature of the resulting defamation and/or false light.

WHEREFORE, Plaintiff Jamie Mannina prays that this Court:

(1) Awards him an amount of damages to be determined at trial, but no less than $75,000;

(2) Awards reasonable costs and attorney's fees as provided in 28 U.S.C. § 2412 (d) and any other applicable law;

(3) Expedites this action in every way pursuant to 28 U.S.C. § 1657 (a); and,

(4) Grants such other relief as the Court may deem just and proper.

Dated: May 14, 2025

Respectfully submitted,

/s/ *Mark S. Zaid*

_____

Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Geoffrey Deweese, Esq.
(*Pro Hac Vice* pending)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
Geoffrey@MarkZaid.com

Attorneys for the Plaintiff