UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMIE MANNINA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 25-cv-01524 (APM) |
| O'KEEFE MEDIA GROUP, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

In January 2025, Plaintiff Jamie Mannina, then a federal defense contractor, went on what he believed were two genuine dates with a woman named "Heidi." Unbeknownst to Plaintiff, "Heidi" was actually Defendant ▮▮▮▮▮▮▮▮, a person hired by Defendants O'Keefe Media Group ("OMG") and James O'Keefe to elicit from Plaintiff details about his political views and federal employment history and to film and record his statements. Defendants used this footage of Plaintiff to create videos and articles for a series called "Dating the Deep State," which Plaintiff alleges paint him as a Pentagon official conspiring with other federal officials to undermine then-President-elect Donald Trump and his incoming administration. The publication of these videos caused Plaintiff to lose his job. Plaintiff subsequently brought this action alleging defamation, false light, fraudulent misrepresentation, conspiracy, and violations of the District of Columbia and federal wiretapping statutes.

Several motions are before the court. First, Defendants move to allow Defendant ▮▮▮▮ to continue to proceed under the pseudonym "Heidi Doe," to which she has heretofore been referred.

Defendants OMG and O'Keefe together move to dismiss, and Defendant ▓▓▓▓ separately moves to dismiss. Defendants OMG and O'Keefe also have joined Defendant ▓▓▓▓'s motion. Objecting to this joinder, Plaintiff moves to sever and strike Defendant ▓▓▓▓'s motion.

For the reasons explained below, the court rules as follows: (1) Defendants' Motion to Permit Heidi Doe to Proceed Under Pseudonym with Partial Sealing and for a Protective Order, ECF No. 34, is granted in part and denied in part; (2) Plaintiff's Motion to Sever Defendants OMG and O'Keefe's Joinder from and/or Striking of Defendant Heidi Doe's Motion to Dismiss, ECF No. 44, is denied as moot; (3) Defendants OMG and O'Keefe's Motion to Dismiss First Amended Complaint, ECF No. 39, is denied; and (4) Defendant ▓▓▓▓'s Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 40, is denied.

## II.    BACKGROUND

### A.    Factual Background

In December 2024, Plaintiff Jamie Mannina was contacted on the dating app Bumble by Defendant ▓▓▓▓▓▓, who was at the time posing on the app as a woman named "Heidi." *See* Notice of Filing of First Am. Compl., ECF No. 33, Ex. 3, ECF No. 33-2 [hereinafter Am. Compl.], ¶ 22. Plaintiff's Bumble profile noted that he worked as an "Artificial Intelligence Senior Advisor" in "Government Consulting." *Id.* ¶ 21. ▓▓▓▓'s profile indicated that she was a 25-year-old traveling nurse holding liberal-leaning political views and who is open to both casual dates and a long-term relationship. *Id.* ¶ 22. Seeking a romantic relationship, Plaintiff engaged with ▓▓▓▓'s outreach. *Id.* After exchanging pleasantries on the app, they continued communicating via text and eventually agreed to meet for a date at Jaleo, a popular restaurant in Washington, D.C. on January 9, 2025. *Id.* ¶ 23.

At Jaleo, Plaintiff and ▮▮▮ were seated in the middle of the restaurant's dining room with other diners nearby. *Id.* ¶ 24. They sat across from each other, and until their dinner arrived, ▮▮▮ kept a personal bag on their table. *Id.* Their conversation began like any other first date would—they spoke about ▮▮▮'s job as a nurse, their families, what they were looking for in a romantic partner—but ▮▮▮ soon began showing particularly acute interest in Plaintiff's job as a federal contractor, his prior experience working for the federal government, and his political views. *See id.* ¶¶ 24–25. Assuring him that she herself did not support then-President-elect Donald Trump and expressing appreciation that Plaintiff was so forthcoming about his views, ▮▮▮ encouraged Plaintiff to describe at length his negative feelings about Donald Trump and incoming Secretary of Defense Pete Hegseth; his prior positions working with then-Senator Hillary Clinton and the State Department; his previous role as a counterintelligence FBI special agent; and his then-present employment as a federal contractor at Booz Allen Hamilton ("Booz Allen") working with the Pentagon. *See id.* ¶ 25.

At Booz Allen, Plaintiff was a strategic analyst working with a directorate within the Joint Chiefs of Staff at the Department of Defense responsible for "Command, Control, Communications and Computers/Cyber." *Id.* ¶¶ 11–12. He supported the Department of Defense and the Joint Staff on "efforts related to artificial intelligence, cybersecurity policy, modernization, and governance" and was "directly supervised by a military officer at the Joint Staff and by two civilian contractors at Booz Allen." *Id.* ¶ 12.

Plaintiff also did volunteer work with an advocacy organization called National Security Leaders For America, which describes itself as a "bi-partisan, all-volunteer organization of former military and civilian leaders uniquely qualified to warn about U.S. national and economic security threats." *Id.* ¶ 13.

Plaintiff spoke in detail about these activities with ▌▌▌▌.  *See* O'Keefe Media Group, *Pentagon Advisor Reveals Conversation "to Explore What We Can Do" to 'Protect People from Trump'* (YouTube, Jan. 14, 2025), https://www.youtube.com/watch?v=V28YKcP-ljk [hereinafter Video 1].  He described his job at Booz Allen as one being "embedded in the Pentagon," *id.* at 0:00–0:10, where he "specialized in artificial intelligence and emerging technologies like quantum, cybersecurity," *id.* at 1:49–1:58.  He also characterized his former position at the FBI as being a "spy hunter."  *Id.* at 0:20–0:25.  When asked about his "overall assessment of Trump," Plaintiff answered that he believed Donald Trump to be "a sociopathic narcissist who is only advancing his name, his wealth, and his fame."  *Id.* at 0:30–0:43; *see also id.* at 11:00–11:26.  Plaintiff also gave his negative opinion of Pete Hegseth.  *Id.* at 2:14–2:28.

Plaintiff also shared that he was nervous about a presentation he was to give the very next day to the Joint Staff at an important meeting taking place in a "very secure room called the Tank."  Am. Compl. ¶ 25; Video 1 at 1:13–1:28.  He described it as a "huge meeting" with "all of the top, top leaders of the United States military on a topic that [he] prepared."  Video 1 at 1:19–1:39; *see also id.* at 7:54–8:37.

▌▌▌▌ was checking her phone and responding to text messages throughout the night.  Am. Compl. ¶ 26.  At the end of the evening, Plaintiff paid the $200 dinner bill, and the two parted ways at approximately 10:00 p.m.  *Id.* ¶ 27.

The next day, Plaintiff and ▌▌▌▌ made plans to go on a second date.  They agreed to have lunch at a restaurant in the Wharf in southwest D.C. on January 11, 2025.  *Id.* ¶ 28.  During that date, ▌▌▌▌ followed up with Plaintiff about his meeting in "the Tank."  *Id.* ¶ 29.  He responded that it "went well."  Video 1 at 1:41.  Despite Plaintiff's attempts at steering the conversation to more personal topics, ▌▌▌▌ persisted in inquiring about Plaintiff's work and politics.  Am. Compl.

4

¶ 29.  ▮▮▮▮ asked so many questions that, at one point, Plaintiff jokingly asked whether ▮▮▮▮ was a spy.  *Id.*

After Plaintiff paid the $30 lunch bill, the two left the restaurant and began walking outside along the Wharf.  *Id.* ¶ 30; *see also* O'Keefe Media Group, *WILD INTERACTION: O'Keefe Confronts Top Pentagon Official Caught on Tape* (YouTube, Jan. 15, 2025), https://www.youtube.com/watch?v=58Glf7ZJVI0 [hereinafter Video 3].  Defendant James O'Keefe, accompanied by two other men with cameras, then approached Plaintiff and ▮▮▮▮ with a microphone. Am. Compl. ¶ 30; Video 3 at 0:00–0:04.  O'Keefe identified Plaintiff by name and said, "Jamie, you're a spy hunter, you say.  Well, I'm a spy hunter too but I'm evidently a better spy hunter than you." Am. Compl. ¶ 30; Video 3 at 0:00–0:07.  As O'Keefe made these statements, ▮▮▮▮ walked away in the other direction. Am. Compl. ¶ 30; Video 3 at 0:04–0:07.  O'Keefe and the camera operators followed Plaintiff around for several minutes along the Wharf and into a parking garage, repeatedly asking Plaintiff whether he believed he is acting ethically and accusing him of being a liar. Am. Compl. ¶ 31; Video 3 at 0:11, 3:52–3:59.  Plaintiff responded occasionally, including by telling O'Keefe to leave him alone, asking why O'Keefe hired a woman to take him out on a date to "accost" and "trick" him, and stating he has done nothing wrong.  Video 3 at 3:35– 3:36, 3:59–4:12, 4:24–4:26.  Once Plaintiff learned O'Keefe's name, Plaintiff called O'Keefe a "known liar" and "known fraudster." *Id.* at 4:44–4:55.  Towards the end of the interaction, Plaintiff raised his voice at O'Keefe, telling him he was "cherry-picking information to mislead and shape [his] opinion onto other people." *Id.* at 5:37–5:45.

On January 13, 2025, O'Keefe contacted the Department of Defense Public Affairs Office with information about Plaintiff as well as footage from the two dates.  Am. Compl. ¶ 32.

Booz Allen also learned about these videos, and Plaintiff was removed from the Pentagon that same day.  *Id.*  The next day, on January 14, Booz Allen terminated his employment.  *Id.* ¶ 33.

On January 14, 2025, OMG posted on its public YouTube channel a video called "Pentagon Advisor Reveals Conversation 'to Explore What We Can Do' to 'Protect People from Trump'" ("Video 1").  *Id.* ¶ 35.  In general, Video 1 is a compilation of video and audio footage of Plaintiff recorded by Defendants during the dates at Jaleo and the Wharf, interspersed with commentary by O'Keefe.  *Id.*  After a brief introduction, *see* Video 1 at 0:00–2:43, a title sequence shows that the video is part of a series called "OMG Investigates: Dating the Deep State," *id.* at 2:43.  The video identifies Plaintiff using his full name and describes him as a "Senior Advisor, Joint Staff, Department of Defense" and as formerly an FBI special agent and special assistant to Hillary Clinton.  *Id.* at 0:00–2:43.  The description underneath the video adds that Plaintiff is an "advisor to the Joint Chiefs of Staff at the Pentagon, former FBI Special Agent, and self-proclaimed 'spy hunter'" who "disclosed to an undercover OMG Journalist his plans to utilize irregular strategies to undermine Donald Trump's presidency."  ███, whose face is obscured throughout the video, is identified as the "OMG Journalist."  Am. Compl. ¶ 35.  O'Keefe is identified as an "investigative journalist."  Video 1 at 3:00.

Video 1 is not made up of long, continuous clips played chronologically, but rather many short clips stitched together over a moody soundtrack, sometimes irrespective of chronology.  For example, it opens with several clips of Plaintiff explaining his job at Booz Allen, his previous work in the FBI, and his views on Donald Trump.  Video 1 at 0:00–0:43.  It next shows ███ asking, "Is there anything you can do to, like, protect American people from stuff that [Donald Trump] might do?"  The video then cuts to a clip of Plaintiff seemingly replying that he is "in conversation with a couple of retired generals to try to explore what we can do."  *Id.* at 0:44–1:01.  In the next

clip, Plaintiff and ███ are at the Wharf, where ███ asks who those retired generals were. Plaintiff replies that they are "one, two, or three star generals and admirals" and "maybe four stars." *Id.* at 1:02–1:12. Later on in the video, the clip of ███ asking Plaintiff what he could do to protect people from Donald Trump is repeated. But this time, the video then cuts to a clip of Plaintiff seemingly replying that he "can't do anything other than [his job]," which is "protecting American interests on artificial intelligence." *Id.* at 11:51–12:09. "[O]utside of that," he continues, he is "in conversation" with the generals. *Id.* at 12:09–12:18. The rest of Video 1 similarly features clips of Plaintiff talking about his meeting in "the Tank," *id.* at 1:13– 1:40; his work with Pentagon senior officials on emerging technologies, *id.* at 6:33–41; and his volunteer work with an organization that "tried to defeat Donald Trump," *id.* at 16:30–17:16.

Later that same day, Defendants posted a second video ("Video 2"). *See* O'Keefe Media Group, *JUST IN: Top Pentagon Advisor Jamie Mannina has just been FIRED* (YouTube, Jan. 14, 2025), https://www.youtube.com/watch?v=85hllXJxJ6s [hereinafter Video 2]. Video 2 shows a statement from a spokesperson for the Joint Staff that clarifies that the "comments by Mannina do not reflect the positions of the Chairman or the Joint Staff." *Id.* at 0:15. It also includes audio clips of a phone call O'Keefe had with that office where the Pentagon spokesperson appears to confirm that Plaintiff was terminated from his position at Booz Allen because of Defendants' "investigation." *Id.* at 1:01–1:12.

The following day, on January 15, 2025, Defendants posted a third video ("Video 3"). Video 3 is primarily video footage of O'Keefe following Plaintiff around the Wharf for several minutes after the second date.

Videos 1 and 3 also were posted on OMG's website that day on two separate web pages. *See BREAKING VIDEO: Top Pentagon Advisor Reveals On Hidden Camera Conversation "with*

*a Couple of Retired Generals to Explore What We Can Do"* to *'Protect People from Trump'*, O'Keefe Media Group (Jan. 15, 2025), https://perma.cc/9SWU-2HHP [hereinafter Webpage 1]; *WILD INTERACTION: O'Keefe Confronts Top Pentagon Official Caught on Tape Saying He's in Conversation "with Retired Generals to Explore What We Can Do"* to *'Protect People from Trump'*, O'Keefe Media Group (Jan. 15, 2025), https://perma.cc/9NQ9-XA92 [hereinafter Webpage 2]. The videos were embedded in the pages and accompanied by stills and text describing the contents of the videos. For example, the page containing Video 1 provides that, "[i]n a recent undercover revelation, Jamie Mannina, a Pentagon advisor to the Joint Chiefs of Staff and former FBI Special Agent, revealed strategies and covert meetings aimed at influencing public perception and undermining the presidency of Donald Trump." Webpage 1. Importantly, it went on to describe the meeting in the Tank as a "collaborat[ion] with retired military leaders . . . to devise methods to counteract Trump's administration." *Id.*

Plaintiff alleges Defendants have executed similar schemes before. According to him, Defendants have previously used dating apps "to arrange dates with individuals whom Defendants OMG and O'Keefe sought to target as part of their efforts to further their extreme partisan political agenda." Am. Compl. ¶ 34. Moreover, he alleges, "Defendant ▮▮▮▮, falsely posing as 'Heidi,' or using other fictitious names, has engaged in similar conduct resulting in videos published by Defendants OMG and O'Keefe on at least three occasions." *Id.*

### B.    Procedural History

Plaintiff initiated this action on May 14, 2025. *See* Compl., ECF No. 1. The initial complaint was filed against OMG, O'Keefe, and "Heidi Doe," a pseudonym for the woman from Bumble Plaintiff knew only at the time to be "Heidi." *Id.* Plaintiff effected service of process on Defendants OMG and O'Keefe, who thereafter filed a motion to dismiss as well as for a more

definite statement.  *See* Defs.' Rule 12(b)(6) Mot. to Dismiss Pl.'s Compl. and Mot. for More Definite Statement, ECF No. 7.  While that motion was pending, the court granted Plaintiff leave to conduct limited discovery as to the true identity of Heidi Doe.  *See* Minute Order, Sept. 8, 2025. After Plaintiff learned Heidi Doe's real name was ███████████, the court ordered Plaintiff to file under seal an amended complaint with references to ██████ and ordered ██████ to respond to that amended complaint.  *See* Order, ECF No. 31.

On November 3, 2025, Plaintiff filed his Amended Complaint under seal.  *See generally* Am. Compl.  On November 24, 2025, OMG and O'Keefe again filed a motion to dismiss, which is substantially similar to their original one.  Defs. OMG & O'Keefe's Mot. to Dismiss First Am. Compl. and Mem. in Supp. Thereof, ECF No. 39 [hereinafter OMG Mot.].  ██████, then still publicly referenced as Heidi Doe, also filed her motion to dismiss that same day.  Def. Doe's Mot. to Dismiss Pl.'s First Am. Compl., ECF No. 40 [hereinafter Doe Mot.].  Simultaneous with these motions, OMG and O'Keefe filed a notice that they would be joining ██████'s motion.  Defs. OMG & O'Keefe's Notice of Joinder to Doe Mot., ECF No. 41.  Plaintiff thereafter filed a motion to sever and to strike ██████'s motion, arguing that OMG and O'Keefe's joinder of ██████'s motion constituted an impermissible successive motion and that ██████'s motion should be stricken to the extent it presents defenses applicable to OMG and O'Keefe.  *See* Pl.'s Mot. to Sever Defs. OMG and O'Keefe's Joinder from and/or Striking of Doe Mot., ECF No. 44, at 3.

On December 10, 2025, ██████ filed a notice under Federal Rule of Civil Procedure 5.1 because her motion challenged the constitutionality of the tortious-purpose exception of the District of Columbia and federal wiretapping statutes.  *See* Def.'s Notice of Constitutional Question, ECF No. 47.  The District of Columbia intervened to defend the constitutionality of the D.C. law, *see* District of Columbia's Notice of Intervention under Rule 5.1 to Defend the

Constitutionality of a District of Columbia Statute, ECF No. 52 [hereinafter D.C. Notice]; Minute Order, Feb. 10, 2026, and the parties thereafter submitted their responses to the District's position, *see* ECF Nos. 55, 56.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation omitted).  The court must also consider a complaint "in its entirety," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007), including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*; *accord N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).

## IV.    DISCUSSION

Plaintiff brings five claims against Defendants: defamation, false light, fraudulent misrepresentation, conspiracy, and violations of the D.C. and federal wiretapping statutes. The parties seemingly agree that the applicable tort law is that of the District of Columbia. *See generally* OMG Mot. (citing D.C. case law); Doe Mot. (same); Pl.'s Mem. in Opp'n to OMG Mot., ECF No. 42 (same); Pl.'s Mem. in Opp'n to Doe Mot., ECF No. 50 (same); Def. Heidi Doe's Reply in Supp. of Doe Mot., ECF No. 51 [hereinafter Doe Reply] (same).  The court does as well and will consider each tort claim under substantive District of Columbia law.  *See Shulman v.*

*Miskell*, 626 F.2d 173, 174 n.5 (D.C. Cir. 1980) ("Since the alleged tort occurred in the District of Columbia, we must, of course, apply District of Columbia law." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))).

### A.    ███████'s Pseudonymity

Before turning to the merits of Defendants' motions to dismiss, the court first addresses Defendant ███████'s Motion to Proceed Under Pseudonym and for Protective Order.

Throughout this litigation, Defendants have maintained that ███████'s name should be sealed. *See, e.g.*, Defs.' Mot. for Protective Order as to Heidi Doe's Identity, ECF No. 14; Defs.' Renewed Mot. for Protective Order as to Heidi Doe's Identity, ECF No. 20. After the court denied Defendants' initial request for failure to oppose Plaintiff's request for discovery as to ███████'s identity or to establish on the merits that sealing was warranted, the court allowed Defendants to renew their motion to seal ███████'s name following the filing of the amended complaint. *See* Order, ECF No. 19 [hereinafter PO Order]. After Plaintiff filed the Amended Complaint, Defendants filed the present motion to permit ███████ to remain under a pseudonym and for a protective order. *See* Defs.' Mot. to Permit Heidi Doe to Proceed Under Pseudonym with Partial Sealing and for a Protective Order, ECF No. 34 [hereinafter Defs.' PO Mot.].

As they did before, Defendants once more assert that ███████'s true name must be kept under seal on the basis that her identity is protected by the District of Columbia reporter's shield law ("Shield Law"), D.C. Code § 16-4702. *See* Defs.' PO Mot. at 5–8; *see also* PO Order. In the alternative, they argue that good cause exists under Rule 26(c) to maintain ███████'s pseudonym. *See* Defs.' PO Mot. at 1. The court is not convinced by either theory.

Defendants still have not shown ███████ is protected by the Shield Law. The District's Shield Law prohibits the compulsory disclosure of "the *source* of any news or information

11

procured by [a] person while employed by the news media and acting in an official news gathering capacity," D.C. Code § 16-4702(1) (emphasis added), creating an absolute privilege for the identities of sources. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1167 (D.C. Cir. 2006) (Tatel, J., concurring in the judgment). The court previously denied Defendants' motion on the ground that they did not present any evidence—"not even a declaration"—to support treating ███ as a source rather than as a journalist. *See* PO Order at 2. Defendants this time come armed with a declaration from ███ *see* Defs.' PO Mot., Sealed Decl. of ███ ("Heidi Doe"), ECF No. 34-1 [hereinafter Doe Decl.], but the declaration only reinforces the court's previous determination that ███ is not a source within the meaning of the Shield Law.

In her declaration, ███ states that she was motivated to pursue "undercover journalism" to expose corruption and promote transparency as to matters of public interest and explains that she was the one who "came up with the idea to film [Plaintiff] as a potential subject leading to important information for the public." *Id.* ¶¶ 2–3. She was trained by OMG in the "techniques of undercover journalism," *id.* ¶ 2, and she received $7,000 from OMG after the publication of the videos and articles about Plaintiff "as an appreciation for [her] contribution," *id.* ¶ 3. ███ describes her activities as "collecting . . . recordings and making observational notes," "provid[ing] all this raw information to OMG's team," and "answer[ing] their questions about context," *id.* ¶ 5, and she compares herself to "prior undercover journalists," *id.* ¶ 10. Defendants refer to ███ in their motion to dismiss as a "citizen journalist" or "undercover reporter," Doe Mot. at 3, 20, and her activities as "undercover newsgathering," *id.* at 18. And they describe ███'s relationship with OMG and O'Keefe as a "working relationship" wherein ███ was "employed or contracted" by Defendants "to conduct an investigation of people like Mr. Mannina, and in the course of that employment she carried out the undercover news investigation." *Id.* at 26; *see also id.* (describing

the relationship as one between "a news outlet and its reporter").  The list goes on.  All of these activities suggest ▮▮▮ was working for OMG and O'Keefe and was not a source.

Nothing in the declaration makes ▮▮▮ any more comparable to the protected "source" in *Grunseth v. Marriott Corp.*, which Defendants again cite to support their position.  *See* Defs.' PO Mot. at 6; PO Order at 3.  ▮▮▮'s collaboration with OMG and O'Keefe does not at all resemble the leaking of internal records by a non-party employee of the defendant company in *Grunseth*. 868 F. Supp. 333, 334 (D.D.C. 1994).  The Shield Law therefore is not a basis on which ▮▮▮ can proceed pseudonymously.  Even Defendants recognize that treating ▮▮▮ as a source protected by the Shield Law is "novel."  Defs.' PO Mot. at 8.

As for Rule 26(c), the court is not moved by Defendants' conjecture about the harassment ▮▮▮ *may* face if her identity were unsealed.  Rule 26(c) permits a court to, with "good cause," withhold from the public certain information "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  In this circuit, courts balance five "non-exhaustive" factors to determine whether a party may proceed anonymously:

> (1) whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;
> (2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties;
> (3) the ages of the persons whose privacy interests are sought to be protected;
> (4) whether the action is against a governmental or private party; and, relatedly,
> (5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*In re Sealed Case* (*In re Sealed Case I*), 931 F.3d 92, 97 (D.C. Cir. 2019).  Because proceeding under a pseudonym is a "rare dispensation from the court," the party seeking pseudonymity "bears the weighty burden of both demonstrating a concrete need for such secrecy, and identifying the consequences that would likely befall it if forced to proceed in its own name." *In re Sealed Case* (*In re Sealed Case II*), 971 F.3d 324, 326 (D.C. Cir. 2020) (internal quotation marks omitted). "Speculative assertions of harm will not suffice." *Id.*

Defendants chiefly focus on the second factor.  They argue that public disclosure of ███████ 's name may invite harassment.  Defs.' PO Mot. at 9–12.  ████████ attests that she fears ████████



███████████████████████████ Doe Decl. ¶¶ 7–8, 10.  She also ████████

██████████████████████████████████████

████████████████████████████████ *id.* ¶ 9, and ████████

██████████████████████████ *id.* ¶ 11.  And she claims that, ████████

████████████████████████████████████ *Id.* ¶ 9.

Though the court is sympathetic to ████████ 's anxieties, that is not enough to continue to proceed under a pseudonym.  Defendants admit that "[n]o specific threat has been made against her yet"—only that she "*could*" be doxed or "*could*" suffer reputational or emotional harm.  Defs.' PO Mot. at 9.  Defendants have not "provide[d] evidence that psychological damage or violent threats are anticipated if" ████████ 's identity is disclosed.  *Roe v. Doe*, 319 F. Supp. 3d 422, 427 (D.D.C. 2018) (internal quotation marks omitted).  ████████ 's fears about ████████████████

████████████████████████████ is entirely speculative.  *See* Doe Decl. ¶ 8. And though she alleges ████████████████████████████████ , she does not claim any threatened violence or harm.  *Id.* ¶ 9.  Even ████████████████████████ is not

14

enough, for "[m]ere embarrassment and harassment"—much less the mere *possibility* of them—are "insufficient to demonstrate the sort of retaliatory harm necessary to satisfy this showing." *J.W. v. District of Columbia*, 318 F.R.D. 196, 200 (D.D.C. 2016) (internal quotation marks omitted); *see also Nat'l Ass'n of Waterfront Emps. v. Chao*, 587 F. Supp. 2d 90, 100 (D.D.C. 2008) ("[R]equests to proceed anonymously have been denied where the [party] merely cites personal embarrassment as the basis of the need for confidentiality."). And Defendants have offered nothing but speculation that there was █████████████████████████████████ ████████████████ *See* Doe Decl. ¶ 9 (stating that it ███████████████████████ ███████████████████████████████████████).

Perhaps continued pseudonymity would not materially prejudice Plaintiff, who is now aware of ██████ 's identity. *See Plaintiff B v. Francis*, 631 F.3d 1310, 1318–19 (11th Cir. 2001). But "[l]awsuits are public events." *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (per curiam). And "[i]dentifying the parties to the proceeding is an important dimension of publicness." *In re Sealed Case I*, 931 F.3d at 96–97 (alteration in original) (quoting *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997)); *see also* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."). The public interest in open judicial proceedings "is a legitimate reason to requiring unsealing" ██████ 's name. *See Qualls v. Rumsfeld*, 228 F.R.D. 8, 13 (D.D.C. 2005).

The other factors either do not weigh in favor of anonymity or fail to tilt the balance in that direction. ██████ is a private party, but she is not a minor, *see Doe v. Cabrera*, 307 F.R.D. 1, 7–8 (D.D.C. 2014), and this case does not involve sensitive or highly personal matters, *see In re Sealed Case II*, 971 F.3d at 327 (listing as examples of "sensitive or highly personal matters" "sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused

15

minors"). And the fact that ███ engaged in First Amendment–protected journalistic activities also is not reason alone for this court to grant the "rare dispensation" of pseudonymity. *See* Defs.' PO Mot. at 15–17. On the contrary, by volunteering to work with OMG and agreeing to dupe Plaintiff knowing that her efforts could be published by OMG on the internet and thus reach a worldwide audience, she accepted some risk that her identity would be uncovered through litigation or otherwise.

The court therefore denies Defendants' motion for a protective order. ███ must proceed as a defendant in this case like any other under her true name and identity. The court, however, is amenable to a protective order keeping under seal ███'s address and contact information. *See* LCvR 5.1(c)(1), (h). The parties may jointly propose a protective order with that narrowed scope.

### B.    Defamation and False Light

The court now turns to the merits. Plaintiff alleges that, "[t]hrough numerous edits and splices from statements made throughout both dates, and even between each date, the various videos and articles [(collectively, the "publications")] were created to intentionally provide false or implied evidence to support Defendant OMG and O'Keefe's fabricated claims that [Plaintiff] was essentially attempting to launch an unlawful coup against President Trump." Am. Compl. ¶ 45. Specifically, he alleges that "Defendants falsely state or imply in their [publications] that Mr. Mannina was a senior Pentagon Official providing direct advice to the [Joint Staff] and part of a subversive 'Deep State' that held covert meetings with retired military leaders, including admirals and generals, who were collaborating from within the Pentagon on the means to undermine and counteract the incoming Trump administration . . . in highly secure locations, including 'The Tank', that were 'reserved for critical defense deliberations.'" *Id.* ¶ 47.

16

"Defendants further falsely state or imply that [Plaintiff], in his official capacity, was lying, spying, conspiring to commit a coup, and acting unethically." *Id.*

Defendants' two motions take different tacks. Defendants argue in ▆▆▆▆'s motion that Plaintiff's defamation claim should be dismissed because (1) as a matter of law, the statements in the publications do not reasonably imply false or defamatory facts and (2) Plaintiff has failed to plead actual malice. Doe Mot. at 7–14. But OMG and O'Keefe additionally appear to argue that the disputed statements are true—that is, that Plaintiff is in fact an "insurrectionist" and "a traitor to our country" with "seditious thoughts and plans" who "plan[ned] to undermine the President of the United States" but "got caught." OMG Mot. at 2.

Drawing all reasonable inferences in Plaintiff's favor, the court holds that Plaintiff's defamation claim may proceed to discovery.

### 1.    Actionable Defamatory Statements

Under District of Columbia law, a plaintiff alleging defamation must prove "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016). A statement is per se defamatory if it represents that the plaintiff committed an unlawful act. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 600 & n.19 (D.C. 2000). A statement is otherwise defamatory "if it tends to injure the plaintiff in his trade, profession or community standing, or to lower him in the estimation of the community." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (citing *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990)). Such a statement "must be more than

17

unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984).

Defamation may also be implied. As its name suggests, defamation by implication "stems not from what is literally stated, but from what is implied." *White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). A plaintiff alleging defamation by implication must prove that (1) "a defamatory inference can reasonably be drawn" from the statements, even if the statements themselves are "materially true," and (2) "the particular manner or language in which the true facts are conveyed" supplies "additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *Id.* at 520; *see also S. Air Transp., Inc. v. Am. Broad. Cos.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989).

The First Amendment requires that liability for defamation may arise only if, "at a minimum, a defendant's statement 'reasonably implies false and defamatory facts.'" *Farah*, 736 F.3d at 534 (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)). "Implicit in this requirement are three protections." *Id.* First, statements that "cannot 'reasonably be interpreted as stating actual facts' about an individual" are not defamatory. *Id.* (quoting *Hustler Mag. v. Falwell*, 485 U.S. 46, 50 (1988)). In other words, "[w]here a defendant's statement 'cannot be construed as representations of fact,' there can be no defamation." *Id.* (quoting *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284 (1974)). Second, at least "where a media defendant is involved," statements on "matters of public concern" must be "provable as false," *Milkovich*, 497 U.S. at 19–20, or at least "verifiable," *Moldea v. N.Y. Times Co.* (*Moldea II*), 22 F.3d 310, 317 (D.C. Cir. 1994). Thus, a statement that is "so imprecise or subjective that it is not capable of being proved true or false" is "not actionable in defamation." *Farah*, 736 F.3d at 534–35 (citing

18

*Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624–26 (D.C. Cir. 2001)). Finally, the statement must be "reasonably capable of defamatory meaning." *Weyrich*, 235 F.3d at 623.

Whether a statement "reasonably implies false and defamatory facts" is a "question of law." *Id.* at 627. And the court must look to the publication "as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc). The context is "critical," *Farah*, 736 F.3d at 535, because "it is in part the *settings* of the speech in question that makes their . . . nature apparent, and which helps determine the way in which the intended audience will receive them," *Moldea II*, 22 F.3d at 314. The "broader social context" is also "vital to a proper understanding of the disputed statements." *Farah*, 736 F.3d at 535 (quoting *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984)).

Defendants argue that, "as a matter of law," the statements "[c]haracterizing Mr. Mannina as being part of a 'Deep State' effort or a 'coup' [are] the kind of political hyperbole and opinionated commentary that is not meant as a literal accusation of criminal conduct" and therefore are "fully protected by the First Amendment." Doe Mot. at 7–8. They cite much case law to stand for the proposition that the First Amendment protects "[s]tatements of political opinion, epithets, and hyperbolic characterizations" because "they are not provably true or false statements of fact." *Id.* at 7. Indeed, the First Amendment protects "statements that cannot 'reasonably be interpreted as stating actual facts' about an individual" to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole.'" *Milkovich*, 497 U.S. at 20 (quoting *Hustler Mag.*, 485 U.S. at 50, 53–55).

But the problem with Defendants' argument is that the disputed statements are more than mere opinion. For example, Defendants argue that "'Deep State' is a subjective pejorative used in

19

political rhetoric to suggest disloyal bureaucratic opposition, and accusing someone of a 'coup' in this figurative context is similarly a dramatic way to impugn one's political allegiance or motivations."  Doe Mot. at 8.  But a reader or viewer of the publications could construe these characterizations as fact.  To start, "[a] classic example of a statement with a well-defined meaning is an accusation of a crime."  *Ollman*, 750 F.2d at 980.  Accusing someone of attempting to stage a "coup" clearly falls within that example.  And such an accusation is "obviously verifiable," *id.* at 980 n.19, and defamatory per se, *Guilford Transp.*, 760 A.2d at 600 & n.19.  Turning to context, the statements appear not in an editorial or op-ed section of a newspaper, where readers are "fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper," *Ollman*, 750 F.2d at 986, but rather in publications that Defendants describe as being the product of "undercover journalism," Webpage 1, or "investigative journalism," Doe Mot. at 2; *see also* Video 1 at 3:00 (identifying O'Keefe as an "investigative journalist").  "Cautionary language" such as "In my opinion . . ." or "Is it not true that . . . ?" that would cause a reader to "discount that which follows" as fact also is absent.  *See Ollman*, 750 F.2d at 983.  Moreover, the videos appear on OMG's website, which touts itself as "uncover[ing] the truth."  *See, e.g.*, O'Keefe Media Group, *Mission*, https://perma.cc/VQD4-EAR3.  All of these could "influence the average reader's readiness to infer that a particular statement has factual content."  *Ollman*, 750 F.2d at 979 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14 (1970)).

OMG and O'Keefe's motion makes the point.  Those Defendants insist that Plaintiff "is nothing less than a traitor to our country" with "seditious thoughts and plans" who "plan[ned] to undermine the President of the United States" but "got caught."  OMG Mot. at 2.  And they contend that "[t]his was Mr. Mannina's chance in life to measure up for his cause of sedition against the

government of the United States, and for a pretty smile, he chose to brag and reveal his secrets." *Id.* at 9. Defendants apparently believe that Plaintiff is in *fact* involved in sedition. And so do the viewers of OMG's videos "to whom [the statements were] addressed." *Afro-Am. Publ'g Co.*, 366 F.2d at 655. On each of the Videos, hundreds of viewers implicitly or explicitly accuse Plaintiff of being a "criminal" or "traitor" who should be charged with "treason" or "sedition." *See, e.g.*, Comment, @bobbob-vw4cc, *on* Video 1; Comment, @Jumbo_Jimbo_in_Limbo, *on* Video 2; Comment, @mdawg-vm3qn, *on* Video 3. These facts render it plausible that the disputed statements can "reasonably be interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20.

The implication that Plaintiff is part of the "Deep State" is a closer call, but that too can be interpreted as stating facts when considered in the overall context. The D.C. Circuit has held that general accusations such as that someone is a "fascist," "Marxist," or even "political activist" are "hopelessly imprecise" and "obviously unverifiable." *Ollman*, 750 F.2d at 987 (citing *Buckley v. Littell*, 539 F.2d 882, 895 (2d Cir. 1976)). Where those terms were used to denounce someone with whom the speaker disagrees or to express "that a person's political outlook is not respectable," they are constitutionally protected opinions. *Id.* at 1000 n.5 (Bork, J., concurring). But that does not mean such terms are not capable of being factual in other contexts. *See id.*; *id.* at 980 n.20. For example, labeling someone as a "Leninist" or "Communist-fronter" may be considered a defamatory factual assertion where those characterizations were also reinforced by additional accusations that the person advocated for "a nationwide conspiracy to discredit local law enforcement agencies and create in their stead a national police force capable of supporting a Communist dictatorship." *See id.* at 1000 n.5 (Bork, J., concurring) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325 (1974)).

21

The "Deep State" implication plausibly resembles this latter example.  Simply accusing someone of being part of the "Deep State" may be an expression "that a person's political outlook is not respectable."  *Id.*  But Defendants have additionally asserted that, as part of the "subversive 'Deep State,'" Plaintiff was a "senior Pentagon official" who held "covert meetings with retired military leaders, including admirals and generals, who were collaborating from within the Pentagon on the means to undermine and counteract the incoming Trump administration" and "was lying, spying, conspiring to commit a coup, and acting unethically."  Am. Compl. ¶ 47.  The imputation that Plaintiff is part of the "Deep State," at least in this case, then, can reasonably be interpreted to state a fact that Plaintiff, by way of membership in the "Deep State," is a government official conspiring to commit crimes against the Trump administration.  That is not "obviously unverifiable."

Moreover, the First Amendment's protection over "statements that cannot reasonably be interpreted as stating actual facts about an individual" was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Milkovich*, 97 U.S. at 18, 20.  The Supreme Court in *Milkovich v. Lorain Journal Co.* explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18–19.  Likewise, characterizing statements such as that Plaintiff was part of a coup or the Deep State as opinion or political epithet does not negate that they "may still imply a false assertion of fact"—that Plaintiff is a government official involved in subversive criminal activity.  And

Plaintiff has alleged that some of the facts on which Defendants base these implications are "incorrect or incomplete," such as that Plaintiff is a "Top Pentagon Advisor" or a "Senior Advisor" to the Joint Staff, much less a government official at all, or that he met with military leaders in the Tank in order to undermine the Trump administration. Am. Compl. ¶¶ 44, 47. So even those statements—which Defendants have argued are not actionable because they are not disparaging but rather "over-credit[] his importance," Doe Mot. at 9—are relevant to Plaintiff's defamation claim.

A few final notes. First, the court agrees with Defendants that Plaintiff's quibble about when his "confrontation" with O'Keefe on the Wharf occurred is not actionable. *See* OMG Mot. at 5. That is not the kind of statement that would "injure the plaintiff in his trade, profession or community standing." *Farah*, 736 F.3d at 534.

Second, OMG and O'Keefe contend that Plaintiff's defamation by implication claim fails because the pleading did not include the "required language" that there was "additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." OMG Mot. at 6–7. Plaintiff was not required to include that precise language. It is enough that he alleges that, "[t]hrough numerous edits and splices from statements made throughout both dates," the publications "were created to intentionally provide false or implied evidence to support [Defendants'] fabricated claims that Mr. Mannina was essentially attempting to launch an unlawful coup against President Trump." Am. Compl. ¶ 45.

And finally, the broader social context. The social context in which a statement is made may make it more or less likely that a reader would be alerted that it is an opinion rather than a fact. *See Ollman*, 750 F.2d at 976. At this stage, it is hard to discern how these statements land in today's political and social environment. A person aligned with Plaintiff's political views may

23

dismiss the accusations as conspiratorial or fictitious. *See* Jon D. Michaels, *The American Deep State*, 93 Notre Dame L. Rev. 1653, 1653–55 (2018). But someone aligned with Defendants' views—such as those commenting on the Videos—may understand them as factual assertions of Deep State efforts. *See id.* The broader social context therefore is at this time inconclusive. That is even more reason to allow the claim to proceed to discovery and to revisit them on summary judgment.

> 2.      *Actual Malice*

Defendants also argue Plaintiff's defamation claim fails because he did not plausibly allege actual malice. Doe Mot. at 11. Though they go into great detail about how the pleadings fall short of plausibility, Defendants offer little explanation as to why Plaintiff was required to plead actual malice in the first place.

In the District of Columbia, a private person alleging defamation need only show "at least negligen[ce]" on the part of the defendant. *Farah*, 736 F.3d at 533. But the First Amendment requires that a public figure prove "that the false statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 502 (1984) (cleaned up) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). This requirement applies even to an otherwise private person if he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351. Such a person is a "limited-purpose public figure." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016). "Whether the plaintiff is a public figure is a question of law to be resolved by the court." *Dameron v. Wash. Mag.*, 779 F.2d 736, 740 (D.C. Cir. 1985).

Defendants insist that Plaintiff was required to plead actual malice because Plaintiff is a limited-purpose public figure. Doe Mot. at 11. But they have not explained at all how Plaintiff "voluntarily inject[ed]" himself into a public controversy. They offer only that Plaintiff "inserted himself into the matters discussed in all of the Defendants' publications." *Id.* at 11–12. That cannot be. "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). Plaintiff believed he was making these statements to a person he was on a date with, not a reporter certain to publish them. And simply discussing "classic matters of public interest" such as "government affairs and political conduct," *see* Doe Mot. at 12, could not possibly be enough by itself to make someone a limited-purpose public figure. *Cf. Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157, 167–68 (1979) ("A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. . . . A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*."). Expressing one's political views on a date or working as a federal contractor without more cannot by any common sense be enough to amount to voluntarily thrusting oneself into a public controversy.

Plaintiff therefore did not need to plead actual malice. And Defendants do not argue that Plaintiff failed to plausibly allege "at least negligence."[1]

*   *   *

Plaintiff's defamation claim can proceed to discovery. So, too, can Plaintiff's false light claim. *See Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007) ("[W]here the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed

---

[1] To be clear, the court does not foreclose Defendants from making the case on summary judgment that Plaintiff is a limited-purpose public figure. At this stage, it is at least plausible that Plaintiff is not.

in the same manner."); *cf. Moldea v. N.Y. Times Co.* (*Moldea I*), 15 F.3d 1137, 1151 (D.C. Cir. 1994) ("Publicity that is actionable in a false light claim generally will be actionable in defamation as well."), *modified on reh'g on other grounds*, *Moldea II*, 22 F.3d 310.  *But see Weyrich*, 235 F.3d at 628 ("[A] plaintiff may only recover on one of the two theories based on a single publication."). These claims also can proceed against all Defendants, including ███. *See* Doe Reply at 5–6.  It is enough that Plaintiff has pleaded that ███ has on multiple occasions collaborated with OMG and O'Keefe to go on dates under a false name for the purpose of recording people's statements, Am. Compl. ¶ 34, and participated in the publication of the disputed statements, *id.* ¶ 49, to plausibly establish her liability.

### C.      Fraudulent Misrepresentation

Next,   Plaintiff's   fraudulent   misrepresentation   claim.      A   claim   of   fraudulent misrepresentation requires proof of "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992).  Plaintiff alleges that ███ "knowingly and deliberately misrepresented herself to Mr. Mannina for the purpose of targeting and entrapping him into making remarks that could be distorted for political and harmful purposes." Am. Compl. ¶ 59.  Using her "inauthentic profile," ███ falsely represented she was romantically interested in Plaintiff, when in fact "[s]he was simply part of an intentional targeted operation against individuals perceived to be Democrats to materially and falsely discredit them." *Id.*  And her false representations were "material to inducing" Plaintiff to go on the two dates with ███ and discuss his views and career. *Id.* ¶ 60.

Defendants first appeal to the First Amendment. *See* Doe Mot. at 18–19.[2]  They contend that the First Amendment precludes a fraud claim against undercover journalists both because "a plaintiff cannot use a fraud label to end-run the constitutional safeguards that apply to speech about matters of public concern" and because the First Amendment "does not countenance using fraud claim to punish the publication of truthful information on a matter of public concern."  *Id.*

Taking the latter first, "the Supreme Court has said in no uncertain terms that 'generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.'" *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999) (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)).  Thus, "far reaching as they may be," First Amendment protections "do not place the unlawful acquisition of information beyond the reach of judicial review." *Council on Am.-Islamic Rels. Action Network v. Gaubatz* (*CAIR I*), 793 F. Supp. 2d 311, 330 (D.D.C. 2011).

As to the first point, it is true that a plaintiff cannot "recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim," namely, the actual malice requirement. *See Food Lion*, 194 F.3d at 522. But there is no concern here that Plaintiff is attempting an "end-run around First Amendment strictures." *Id.*  The court has already decided that, at this stage, Plaintiff is not a public figure and therefore does not need to plead actual malice. *See supra* Section IV.B.2.

To be sure, it will be Plaintiff's burden to prove that Defendants are liable for damages arising out of Plaintiff's mental distress, loss of employment, and reputational consequences, and to establish causation as to each. *See* Doe Mot. at 23; *Democracy Partners v. Project Veritas Action*

---

[2] OMG and O'Keefe's motion does not itself offer any substantive arguments.  It rather accuses Plaintiff of "blam[ing] a lady for not being honest as to her motives" instead of "blaming himself for having a big mouth and spilling secrets." OMG Mot. at 9.  Apparently, his "audacity is similar to a man who kills his parents and then throws himself upon the mercy of the court, claiming that he is an orphan."  *Id.*

*Fund* (*Democracy Partners I*), 285 F. Supp. 3d 109, 118 (D.D.C. 2018) ("Plaintiffs will ultimately bear the burden of proving that actual damages were proximately caused by defendants' alleged fraudulent misrepresentations."). "[B]ut certainly at this point it would be premature to preclude [him] from trying to do so." *Democracy Parters I*, 285 F. Supp. 3d at 118; *see id.* at 117 ("[I]t is well-established that proximate cause is generally a factual issue to be resolved by the jury . . . ." (cleaned up)).

Plaintiff otherwise has plausibly alleged fraudulent misrepresentation. Plaintiff has alleged with sufficient "particularity"—as required by Rule 9(b)—that ▬, in coordination with OMG and O'Keefe, knowingly made false representations about her political views and purpose for being on Bumble upon which Plaintiff relied to make statements that Defendants recorded, edited, and published, causing the loss of his employment. *See* Am. Compl. ¶¶ 59–62. Defendants argue that liability for fraud cannot arise out of non-commercial or transactional settings and that the particular context of a date renders misrepresentation and reliance untenable, but they offer no case law to either effect. *See* Doe Mot. at 20–21. What's more, ▬'s conduct was not akin to simply misrepresenting herself to impress a suitor; she deliberately fabricated a persona and received a fee to elicit information from Plaintiff that she had reason to believe OMG and O'Keefe would use, at least in part, for commercial purposes.[3] The court therefore will not dismiss the fraudulent misrepresentation claim.

### D.    Civil Conspiracy

"[C]ivil conspiracy depends on performance of some underlying tortious act." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000). There must be "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful

---

[3] OMG and O'Keefe embedded paid advertisements within all three Videos.

act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Id.*

Defendants only offer two arguments to dismiss this claim. First, they maintain the civil conspiracy claim must be dismissed because the underlying tort—fraudulent misrepresentation—should also be dismissed. OMG Mot. at 10; Doe Mot. at 24–26. The court has permitted the fraudulent misrepresentation claim to proceed, *see supra* Section IV.C, so that is not grounds to dismiss the civil conspiracy claim.

Second, they contend that Plaintiff has not pleaded there was an agreement to participate in an unlawful act. Doe Mot. at 26–27. According to Defendants, Plaintiff has done no more than to "infer[] a 'conspiracy' from the mere fact that multiple people were involved in a news investigation." *Id.* at 27. A news outlet and a reporter working "hand-in-glove to produce a story" is "lawful activity." *Id.* at 26. But "[t]he most obvious problem with [Defendants'] argument is that they are asking the Court to accept as true their interpretation of the facts alleged in the complaint and to reject plaintiffs' contrary allegations." *Democracy Partners I*, 285 F. Supp. 3d at 117. "[T]hat is precisely the opposite of what a court must do in ruling on a motion to dismiss." *Id.* The court cannot say now whether Defendants' agreement to work together was lawful or unlawful. Plaintiff also did not need to plead the details of "when this agreement was made, how it was made, or what its terms were." *See id.* at 27. Discovery will bear out those facts.

### E.   Wiretapping

Plaintiff alleges that the statements made and recorded while on the dates and during the confrontation at the Wharf are oral communications intercepted for the purpose of committing a tortious act in violation of the D.C. and federal wiretapping statutes. Am. Compl. ¶¶ 69–70.

Under both statutes, it is unlawful to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire or oral communication." 18 U.S.C. § 2511(1)(a); *see* D.C. Code § 23-542(a)(1). An "oral communication" is "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2); *see* D.C. Code § 23-541(2).

Even where that expectation is justified, both the D.C. and federal wiretapping statutes permit the interception of oral communications as long as one party to the communication has consented to the recording. *See* 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3). But both also provide that this single-party consent rule does not apply if the communication is intercepted "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3).

Defendants first argue that Plaintiff has failed to plausibly allege that his expectation that his statements would not be intercepted was justified, because (1) ▮▮▮▮ was a "new acquaintance" with whom he was meeting for the first time; (2) the dates were in public restaurants full of other people; (3) ▮▮▮▮ 's use of a phone during the dates to send texts meant Plaintiff was on notice that ▮▮▮▮ was in possession of a recording device; and (4) recording devices were clearly used during the Wharf "ambush." Doe Mot. at 30–31. Defendants again mistakenly ask the court to draw inferences in *their* favor from the facts alleged in Plaintiff's complaint. And the inferences they urge "call[] for the consideration of a host of intensely fact-bound circumstances." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz* (*CAIR II*), 891 F. Supp. 2d 13, 25 (D.D.C. 2012). So "[a]t this early stage of the proceedings, Plaintiff['s] allegations are sufficient to permit

30

an inference that the communications at issue were made with a reasonable expectation that they would not be subject to interception." *Id.*

In a final effort, Defendants aver that the tortious-purpose exception is unconstitutional under the First Amendment, on its face and as applied. Doe Mot. at 32–36. Defendants advanced the same arguments before the court in *Democracy Partners v. Project Veritas Action Fund* (*Democracy Partners II*), which held that the wiretap statutes are constitutional because they are content neutral and clear intermediate scrutiny. *See* 453 F. Supp. 3d 261, 288–90 (D.D.C. 2020). The District of Columbia urges that decision "be adopted here." D.C. Notice at 6. The court denies Defendants' motions to dismiss on this issue but will not decide it now. This decision is currently on appeal, *see Democracy Partners, LLC v. Project Veritas Action Fund*, No. 25-7080 (D.C. Cir.), and the D.C. Circuit held oral arguments in January of this year, *see id.*, Doc. 2154365 (Jan. 15, 2026). The court will revisit the issue on summary judgment, likely at that point with guidance from the Circuit. Permitting the wiretapping claims to proceed will not enlarge the scope of discovery, given that all claims rely on the same allegations.

## V.  CONCLUSION

For the foregoing reasons, the court rules as follows:

1.  Defendants' Motion to Permit Heidi Doe to Proceed Under Pseudonym with Partial Sealing and for a Protective Order, ECF No. 34, is granted in part and denied in part. To the extent ▮▮▮▮ requests a protective order as to her address and contact information, the parties shall meet and confer and file by August 12, 2026, a joint proposed protective order only as to such information. Otherwise, any filings previously sealed for purposes of concealing ▮▮▮▮ 's identity shall be unsealed upon expiration of Defendants' time to appeal this ruling.

2. Plaintiff's Consent Motion to Seal Memorandum in Opposition to Defendants' Motion and Memorandum to Permit Heidi Doe to Proceed Under Pseudonym with Partial Sealing and for a Protective Order, ECF No. 36, is granted conditionally until ███████'s time to appeal this ruling expires.

3. Defendants OMG and O'Keefe's Motion to Dismiss First Amended Complaint, ECF No. 39, is denied.

4. Defendant ██████'s Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 40, is denied.

5. Because Defendants' motions to dismiss are denied, Plaintiff's Motion to Sever Defendants O'Keefe Media Group and James O'Keefe's Joinder from and/or Striking of Defendant Heidi Doe's Motion to Dismiss, ECF No. 44, is denied as moot.

Dated: July 29, 2026

_____
Amit P. Mehta
United States District Judge

32